UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ZACHARY FORD<br><br>                    Plaintiff,<br><br>v.<br><br>MARCH FOR OUR LIVES ACTION FUND and JACLYN CORIN, jointly and severally,<br><br>                    Defendants. | Civ. No. 1:25-cv-05214-JHR-JEW<br><br>**COMPLAINT**<br><br>**Trial by Jury Demanded** |

Through his attorneys, Eisner Dictor & Lamadrid, P.C., plaintiff Zachary Ford ("Plaintiff" or "Mr. Ford") alleges and complains as follows:

**NATURE OF THE ACTION**

1. In March 2025, March for Our Lives Action Fund ("March for Our Lives" or "the Organization) and its Executive Director Defendant Jaclyn Corin ("Ms. Corin") (jointly, the "Defendants") abruptly terminated the entire staff of March for Our Lives, including the Plaintiff, from their employment.

2. Defendant Corin disingenuously stated to the laid-off staff members as well as the media that the reason for the mass termination of the Organization's entire staff had to do with financial trouble within the Organization, yet the real reason was that Plaintiff and a group of his colleagues had begun to express opposition to race discrimination within the Organization's board of directors (the "Board") only weeks earlier.

3. Plaintiff brings this action pursuant to New York City Human Rights Law ("NYCHRL") to recover actual, compensatory and punitive damages from the intentional actions of Defendants in retaliating against him after he opposed race discrimination at the Organization. Plaintiff also seeks pre- and post-judgment interest, costs, attorneys' fees, and such other relief as the Court deems appropriate.

1

## THE PARTIES

4. Plaintiff is an adult individual who resides in Kings County, New York.

5. Defendant March for Our Lives Action Fund is a not for profit organization designated as a 501(c)(4) under the laws of New York State with its New York mailing address located at 90 Church St., #3417, New York, NY 10008.

6. Defendant Jaclyn Corin is the Executive Director of March for Our Lives, and is a resident of Washington, D.C.

7. Ms. Corin was the main actor and decision-maker behind the Plaintiff's unlawful termination from his employment at March for Our Lives.

## PROCEDURAL HISTORY

8. On June 5, 2025, the Plaintiff commenced this action by filing a Summons with Notice in the Supreme Court of the State of New York, County of New York.

9. On June 23, 2025, Defendants removed the Plaintiff's action to the Southern District of New York, on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332.

## JURISDICTION AND VENUE

10. Plaintiff originally filed this matter in the Supreme Court of the State of New York, County of New York, who has subject matter jurisdiction as this action arises under the laws of the City of New York, specifically, the New York City Human Rights Law, NYC Admin Code § 8-101, *et seq.*

11. Venue in the Supreme Court of the State of New York, County of New York is proper since the actions giving rise to the Plaintiff's claims occurred within New York County.

12. However, Defendants removed this matter to the Southern District of New York.

**STATEMENT OF CLAIMS**

**Background**

13. Mr. Ford began working for March for Our Lives on Monday, November 6, 2023.

14. Plaintiff was proud to begin working for the Organization, as he believed strongly in its mission to end gun violence in the United States.

15. The terms of Mr. Ford's employment for the Organization involved the Plaintiff's fundraising and being responsible for stewarding and cultivating current and new donors in support of the Organization's mission to end gun violence in all its forms, with March for Our Lives relying on Plaintiff to collaborate with the Executive Director to set strategy and spearhead fundraising efforts, championing the lifesaving work of the Organization's youth movement with supports across the country, and having Plaintiff provide leadership, supervision, oversight, and management of the organization's development team.

**Mr. Ford's History of Excellent Performance**

16. Mr. Ford demonstrated nothing but outstanding performance during his tenure at March for Our Lives.

17. For instance, Plaintiff's "90-Day Check-in," covering the period of November 6, 2023 through February 6, 2024, was supervised by the then Executive Director of the Organization Natalie Fall, and Ms. Fall raved about the Plaintiff's demonstrated excellence and leadership.

18. Moreover, Mr. Ford's 2024 Annual Review, covering the period of January 1, 2024 through December 31, 2024, also completed by Ms. Fall, and she again raved about how outstanding he was in his role, and noting that any failure to meet his goals was based on factors outside of his control.

19. In addition, an email from Board Member and former Development Committee Co-Chair Kei Kawashima-Ginsberg on August 29, 2024 stated the following: "Thank you Alyssa, Raymond and Zach [Ford]! Awesome job again, for getting Ballmer. Really a strong financial footing as well as a reassuring message to the civil society philanthropic community."

20. Furthermore, the Board of Directors wrote the following, in response to Ms. Fall's email on December 4, 2024 about the successes of the 2024 Giving Tuesday campaign:

> "This was an all hands effort by staff and Boards, led by Zach [Ford] and Alyssa! Great job all, thank you to Michael and Aileen for your generosity and big props to the Dev and Coms teams for pulling this all together. There will be much to learn from the work Caryn is doing to help us with our strategy for 2025, but this kind of support given the elections is something we can definitely build on for next year!" -José Gonzalez, Chair of the Foundation Board.
>
> "Congratulations to the entire team. It was a great, successful effort." -Michael Golden, Treasurer.

21. On February 4, 2025, the Organization's Board of Directors held a conference call with the Development Committee, at which were present the following Board Members: Aileen Adams (Member), José Gonzalez (Chair of the Foundation Board), Kei Kawashima-Ginsberg (Member), Michael Golden (Treasurer), Caroline McCarthy (Co-Chair, Development Committee), and Nate Mook (Co-Chair, Development Committee).

22. During the February 4, 2025 Board of Directors' conference call, then Executive Director Ms. Fall and Board members Aileen Adams, Michael Golden and Jose Gonzalez praised the work of the Plaintiff, noting that although the year had been an "unpredictable roller coaster" for fundraising, a "strong foundation" had been set by Plaintiff and his colleagues, also noting that their work had been "terrific."

23. Indeed, under the Plaintiff's leadership, March for Our Lives' Philanthropic Foundation Revenue went from $535,000 in 2023 to $1,197,147 in 2024.

4

24. Moreover, March for Our Lives' Corporate Revenue went from $94,459 in 2023 to $207,587 in 2024 thanks to the Plaintiff's efforts.

25. And while March for Our Lives' small dollar and digital fundraising did underperform in 2024 compared to 2023, since June of 2024 (following changes to the digital fundraising program that the Plaintiff led and implemented), March for Our Lives' revenue had steadily increased with every passing month.

26. Moreover, revenue in January 2025 was $20,000 higher than it was in January 2024.

27. Due to his outstanding work, in February 2025, the Executive Director awarded the Plaintiff a 4% raise retroactive to January 1, 2025, raising his annual salary from $140,000 to $144,200.

## March For Our Lives Announces Racist New Policy

28. In December 2024 the Board of Directors decided to conduct a strategic planning process, stating that the current programmatic work was not raising enough money.

29. After going through a process that involved, *inter alia*, interviews with each Board member, it was announced that the Board of Directors had decided that the Organization should stop focusing attention on "marginalized black and brown communities," and focus on "the white boy narrative."

30. Thus, a strategic planning report was issued redirecting the Organization to focus on ending gun violence in white communities only.

## Plaintiff and His Colleagues Oppose Racism

31. During an in-person strategic planning retreat that was held in Chicago from February 21, 2025 to February 23, 2025, members of the Organization's senior leadership team, including the Plaintiff, expressed opposition to the Board's racially discriminatory agenda

contained within the strategic planning report that redirected the Organizations to focus on white communities only.

32. In fact, during the opening session on Saturday, February 22, 2025, multiple members of the senior leadership team, including the Plaintiff, on behalf of the organization's staff, took turns stating their concerns about the Board's racist turn of policy described within the strategic planning document.

33. Unfortunately, no one from the Board wanted to hear about the problem or entertain these concerns.

34. As a result, on Saturday, February 22, 2025, one of the few board members of color stated that he no longer felt there was a place for him in the Organization, and he therefore resigned on the spot.

35. Michael Golden, Treasurer of the Board of Directors, responded by stating that "these things happen" and the Organization would "move on."

36. No one from the Board of Directors was interested in understanding why one of the only board members of color had abruptly departed.

**Amidst Staff Opposition to Racism, Jaclyn Corin becomes Executive Director**

37. The next day, Sunday, February 23, 2025, and with no explanation, the Board of Directors suddenly removed the Executive Director, Natalie Fall, from her position, replacing her with Defendant Jaclyn Corin, a 24-year old co-founder of the organization with no experience in the nonprofit sector, fundraising, union labor management, organizing, legislative work, judicial advocacy, finance, operations, or human resources.

38. On Monday, March 3, 2025 a call for the entire staff was held that included Melissa Scholz (the Board Chair), Michael Golden (treasurer), and Caroline McCarthy (a Board member).

39. Ms. Scholz opened the call by providing an overview of the interim leadership selection process, including naming the committee members and stating that updates should be provided to staff by the end of the week or early the next week.

40. The Plaintiff and members of staff asked many questions of the Board members in attendance on this call, including many questions about the Board's racially discriminatory proposals contained in the strategic planning report.

41. The Board members deflected most questions, became visibly frustrated and hostile around questions relating to racism within the Organization's Board of Directors, stated to the staff that they should prepare for their job descriptions to be changed, and refused to stay on the call with staff to help reduce anxieties and provide clarity.

42. In response to specific questions about racist comments in the strategic planning report, Ms. Scholz stated that the report was "hard to read" and contained "hard truths." She also stated that the strategic planning retreat revealed a lack of alignment between the Board of Directors and members of staff.

**Defendants Create a Pretext for Retaliation as Opposition to Racism Mounts**

43. On March 10, 2025, all of the Organization's staff members received an email from Human Resources stating there would be a special staff coordination call with Board leadership at 2:00 p.m., and that the new interim leadership plan would be announced.

44. Plaintiff received a separate email from Board Chair Ms. Scholz requesting a call prior to the entire staff meeting.

45. During this call, the Plaintiff was told that there were only two months of operating expenses remaining across all accounts.

46. This news of "financial trouble" came as a shock to the Plaintiff, since he was the Director of Development, and only a few months prior the Board had informed him that the financial health of the Organization was fine, and that there were more than six months of operating expenses.

47. Soon thereafter, the Plaintiff joined the previously scheduled all staff call with the Organization's Board.

48. During this call, the subject of race discrimination from the Board's strategic planning report was again raised by several staff members, one of whom was a woman of color named Madelyn.

49. Ms. Scholz spoke to the white staff members respectfully and calmly listened to their concerns, yet when it came to Madelyn, Ms. Scholz shut her down and completely disrespected her in front of the entire staff.

50. During this meeting, a white staff member stated that there was "a clear difference" between the way Ms. Scholz addressed her fellow white staff members to the way she dismissively spoke to Madelyn.

51. Ms. Scholz responded, "Thank you. All I can say is I'm sorry and thank…And I will be stepping down tomorrow. Everyone can be thrilled about that just know that I've done my best. So, thanks for all the work that you all are doing and, um, I will hope that success continues to come…I did act aggressively because I'm, I'm so frustrated that what I think is our truth and what we so deeply believe is so not heard. And so, I did do that. I'm really sorry. I saw Madelyn's eyes react, and I knew that I had spoken inappropriately."

52. Immediately following the staff call on Monday, March 10, 2025, all staff members received an email from Ms. Corin asking to schedule a one on one meeting with her over the next few days.

53. On March 11, 2025, the Plaintiff met with Ms. Corin, during which time he informed her that many of the staff members felt "like their identities are not seen," and noting that the Organization's racist plan to focus on white only communities was a problem, and that he was loyal to these staff members and wanted to help find a solution where their needs were also heard.

54. Ms. Corin responded by saying, "I appreciate you for supporting the staff amidst all of this and stepping up in that way…It's within everyone's interest to keep everyone around to uplift the work that they're doing…But given that you have such a strong relationship with staff, I think it's going to be paramount that, you know, your leadership and trust with them is used to kind of steer us in as forward looking of a direction as possible. And that does not mean that I don't plan on speaking to everyone and hearing them and their perspective of what's been going on for the last few weeks…I want everyone to feel like a team. I want us to all, you know, be able to build together so we can celebrate wins together…You clearly have a strong relationship with them. I would deeply appreciate if you can use that relationship to, you know, encourage everyone to give me a chance and to give this a chance and to open their hearts and minds to trust, um, knowing that I don't want to get rid of anyone."

**Defendants Retaliate by Terminating the Entire Staff of March for Our Lives**

55. Following the meeting with the Plaintiff, Ms. Corin canceled all previously scheduled one on one meetings with the staff.

9

56. On Thursday, March 13, 2025, the Plaintiff invited Ms. Corin to join the weekly call with the digital strategy firm, Middle Seat, to introduce herself and discuss strategy around how to communicate about the executive transition. Ms. Corin declined to attend and stated that she would set up time to speak with the account lead one-on-one.

57. On Monday, March 17, 2025, the weekly all staff meeting was canceled by Ms. Corin and reschedule for Wednesday, March 19, 2025. This meeting was subsequently canceled and rescheduled for Thursday, March 20, 2025.

58. Ms. Corin also canceled the weekly senior leadership team meeting, which was scheduled for Tuesday, March 18, 2025.

59. Ms. Corin was scheduled to join a meeting with the major gifts consulting firm, Hudson Ferris, with the Plaintiff on Monday, March 17, 2025, to introduce herself and discuss a strategy for engaging major donors around the executive transition. Ms. Corin did not join the call and did not notify the Plaintiff that she would not be joining. Several minutes into the meeting, the Plaintiff messaged her on Slack to see if she was planning to join us. She responded that she would meet with the consultants separately and requested their contact information.

60. During an exchange on Slack with Ms. Corin the week of March 17, 2025, the Plaintiff asked Ms. Corin if she could please share her fundraising plan with the Plaintiff and the development team so that they could begin incorporating it into their 2025 goals and activities.

61. Ms. Corin responded that the plan would be revealed to all of the Organization's staff during the staff meeting scheduled for Thursday, March 20, 2025.

62. During the week of March 17, 2025, Ms. Corin emailed the Development Team and requested a list of all major donors and institutional funders, along with their primary point of contact and contact information.

63. On Thursday, March 20, 2025 at 3:30 p.m., the Plaintiff joined the staff meeting that Ms. Corin had been promoting to staff all week as the meeting in which she would be unveiling her plans for the organization and her fundraising strategy.

64. Present on the call was Ms. Corin, and Board Members Melissa Scholz, Michael Golden, and José Gonzalez, along with Sherrisse-Lee Lewis, Director of Finance and Operations; Erika Loach, Senior Operations and People Manager; and members of the senior leadership team, including Plaintiff, Zeenat Yahya (the Policy Director), and Ciara Malone (the Legal Director).

65. During this staff call, Ms. Corin terminated every member of the Organization's staff with the exception of Ms. Lewis and Ms. Loach.

66. The reason for the mass termination of the Organization's staff, as stated by Ms. Corin, was that the Organization did not have any funds to continue paying salaries.

67. During the meeting, the Plaintiff asked the Board members on the call to please explain why the first time the employees were hearing about the dire financial situation of March for Our Lives was on a call to lay off the entire staff.

68. No one from the Board was able to answer Plaintiff's question.

69. On Thursday, March 20, 2025, March For Our Lives had an article placed in the digital news outlet, The 19th.

70. In this article, Ms. Corin blamed laying off the entire staff of the Organization on fundraising, stating that the Organization failed to raise enough money to support its staff, citing that only $1.42 million was raised in 2023.

71. The information provided by Ms. Corin to the news outlet The 19th was inaccurate, as it only represented the funds raised through the March For Our Lives Foundation: the combined

revenue between the March For Our Lives Action Fund and March For Our Lives Foundation in 2023 was $3,613,702.82.

72. Ms. Corin also failed to address the Organization's 2024 finances, during which time the Development Team successfully raised $3.5 million between the two entities.

73. It is therefore clear that the real reason for the Plaintiff's (and his fellow staff members') termination was because they had opposed the Board of March for Our Live's race discrimination and not the pretextual reasons stated by the Defendants.

**FIRST CAUSE OF ACTION**
**New York City Human Rights Law, NYC Admin Code § 8-101** *et seq.*
*Retaliation for Opposing Race Discrimination*

74. Plaintiff repeats and realleges each preceding paragraph as if set forth fully herein.

75. During the relevant time period, Plaintiff opposed race discrimination, and as a direct consequence, shortly thereafter the Plaintiff was terminated from his employment in retaliation for his opposition to race discrimination.

76. Pursuant to NYCHRL and all other applicable law, Plaintiff seeks and is entitled to recover damages and penalties for Defendants' unlawful termination of him from his employment, statutory pre-judgment interest, costs, attorneys' fees, and post-judgment interest, along with such other relief as this Court deems just and proper.

**PRAYER FOR RELIEF**

Plaintiff respectfully requests that this Court grant him the relief to which he is entitled and:

(a) enter judgment declaring that Defendants willfully violated NYCHRL;

(b) award Plaintiff actual damages he is owed pursuant to NYCHRL;

(c) award Plaintiff compensatory damages he is owed pursuant to NYCHRL;

(d) award Plaintiff costs, disbursements, and attorneys' fees pursuant to NYCHRL;

(e) award Plaintiff pre- and post-judgment interest as provided by law; and

(f) grant such other relief as is just and proper.

Dated: July 18, 2025

                                                Respectfully submitted,

                                                EISNER DICTOR & LAMADRID, P.C.

By: _____
                                                Maria L. Chickedantz
                                                39 Broadway, Suite 1540
                                                New York, NY 10006
                                                Tel: (212) 473-8700
                                                Fax: (212) 473-8705
                                                *Attorneys for Plaintiff*